1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURELIO M. SEPULVEDA, | CASE NO. 1:05-cv-01143-AWI-DLB PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S |
| v. | MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| SHU-PIN WU, | (DOC. 61) |
| Defendant. | |
| _____/ | OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

**Findings And Recommendations**

**I.      Background**

Plaintiff Aurelio M. Sepulveda ("Plaintiff") is a prisoner in the custody of the California

Department of Corrections and Rehabilitation ("CDCR").  Plaintiff is proceeding pro se and in

forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding

against Defendant Shu Pin Wu for retaliation in violation of the First Amendment and deliberate

indifference to a serious medical need in violation of the Eighth Amendment.  Pending before the

Court is Defendant's motion for summary judgment, filed September 22, 2011.  Def.'s Mot.

Summ. J., Doc. 61.  Plaintiff filed his opposition on February 1, 2012.[1]  Pl.'s Opp'n, Doc. 71.

Defendant filed his reply on February 6, 2012.  Def.'s Reply, Doc. 74.   The matter is submitted

pursuant to Local Rule 230(l).

_____

[1] Plaintiff was informed of the requirements for opposing a motion for summary
judgment by a Court order on January 15, 2010.  Second Informational Order, Doc. 34; *see Rand
v. Rowland*, 154 F.3d 952, 955-56 (9th Cir. 1998) (en banc).

## II.    Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id.* at 324.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.* at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2002); *T.W. Elec.*

2

1    *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

2    dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

3    nonmoving party, *Long v. County of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Wool v. Tandem*

4    *Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

5           In the endeavor to establish the existence of a factual dispute, the opposing party need not

6    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

7    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

8    trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

9    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

10   *Matsushita*, 475 U.S. at 587 (quoting former Rule 56(e) advisory committee's note on 1963

11   amendments).

12          In resolving a motion for summary judgment, the court examines the pleadings,

13   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

14   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, *Anderson*, 477

15   U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

16   court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United*

17   *States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

18          Finally, to demonstrate a genuine dispute, the opposing party "must do more than simply

19   show that there is some metaphysical doubt as to the material facts. . . .Where the record taken as

20   a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

21   issue for trial.'" *Matsushita*, 475 U.S. at 586-87 (citations omitted).

22   **III.    Statement Of Facts[2]**

23   ───────────────────

24          [2] All facts are considered undisputed, unless otherwise noted. Pursuant to Local Rule
     260(b) and Federal Rule of Civil Procedure 56(c), all disputes with the movant's statement of
25   facts must be supported with citation to evidence.  *See* L. R. 260(b) (parties opposing Statement
     of Undisputed Facts shall deny those that are disputed, "including with each denial a citation to
26   the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or
     other document relied upon in support of that denial").  Plaintiff's opposition does not include
27   citation to each fact that is disputed, but includes a declaration and exhibits in support.
     Plaintiff's declaration will be considered to the extent that it is made on personal knowledge, sets

28

Plaintiff is a prisoner in the custody of the CDCR and was housed at California Substance Abuse Treatment Facility (CSATF) in Corcoran, California, during the events alleged in this action.   Defendant Wu is a licensed physician in the State of California.   Wu Decl. ¶1. Defendant Wu graduated with a doctorate in medicine in 1972.   *Id.*   Defendant Wu was employed as a physician with CDCR at CSATF  from January 27, 2003 to May 31, 2008.   *Id.* Defendant Wu's responsibilities at CSATF included the medical treatment of inmates.   *Id.* ¶2. In order to effectively treat all of the inmates at CSATF, physicians rotate yards as determined by the prison's Medical Director.   *Id.*   As a result, Defendant Wu would only treat inmates in a particular yard for a few months before he was rotated to another yard.   *Id.*

One of the inmates Defendant Wu treated is Plaintiff.   *Id.* Defendant Wu was Plaintiff's principal care provider from February 18, 2003 to July 2003, and from March 2004 to April 29, 2005.   *Id.*   Defendant Wu, along with other medical providers, treated Plaintiff for a variety of medical conditions, including treatment for his right eye and diabetic neuropathy. *Id.*

At CSATF, Defendant Wu could submit referral orders for inmate's to receive specialty care by outside medical providers, but he could not schedule the appointment.   *Id.* ¶3. The prison's Utilization Management schedulers are responsible for scheduling appointments for inmates with outside providers.   *Id.*

Insulin is a naturally occurring hormone secreted by the pancreas.   *Id.* ¶4.  Insulin works to lower levels of glucose (sugar) in the blood and is required by the cells to remove and use glucose from the blood.   *Id.*   From glucose the cells produce the energy that they need to carry out their functions.   *Id.*   Diabetes Mellitus, often simply referred to as diabetes, is a metabolic disease in which a person has high blood sugar (glucose), either because the body does not produce enough insulin, or because cells do not respond to the insulin that is produced.   *Id.*

Diabetic neuropathy is damage to nerves in the body that occurs due to high blood sugar levels from diabetes. *Id.* ¶5.  Some people with nerve damage have no symptoms.  *Id.*. Others

_____

out facts that would be admissible in evidence, and shows that he is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).  The Court will consider only those facts and evidence that are relevant to resolving the motion for summary judgment.

1  may have symptoms such as pain, tingling, or numbness in the hands, arms, feet, and legs. *Id.*

2  There are no treatments to reverse diabetic neuropathy, symptoms can only be managed.  *Id.*

3  The first step in managing diabetic neuropathy symptoms is to bring blood glucose levels within

4  the normal range to help prevent further nerve damage.  *Id.*  Blood glucose monitoring, meal

5  planning, physical activity, and diabetes medicines, such as insulin, help control blood glucose

6  levels, and alleviate some symptoms.  *Id.*

7         Doctors can also prescribe oral medications to help with diabetic neuropathy pain.  *Id.*

8  Doctors prescribe anti-inflammatory nonsteroidal drugs, such as aspirin and Naproxen;

9  anticonvulsants Dilantin, Gabapentin (neurontin) and carbamazepine (Tegretol); and tricyclic

10 antidepressants such as paroxetine (Paxil) and amytriptaline (Elavil) are also commonly

11 prescribed to help decrease pain and to help with sleep.[3]  *Id.*

12        Review of Plaintiff's medical file shows that Plaintiff was diagnosed with diabetic

13 neuropathy on March 12, 2002.  *Id.* ¶ 6, and Ex. A.  Plaintiff was prescribed Tegretol for the

14 treatment of his diabetic neuropathic nerve pain.  Wu Decl. ¶ 6, and Ex. A.  On July 26, 2002,

15 Plaintiff saw Dr. Madrilejo for his diabetic neuropathy.  Wu Decl. ¶6, and Ex. A.  Dr.

16 Madrilejo's progress note provides that Plaintiff tried neurontin but it did not help and Plaintiff's

17 GI (gastrointestinal) symptoms increased.  Wu Decl. ¶6, and Ex. A.  As a result, Dr. Madrilejo

18 recommended that Plaintiff be prescribed Elavil for his neuropathy pain.  Wu Decl. ¶6, and Ex.

19 A.

20        Elavil or amitriptyline is in a group of drugs called tricyclic antidepressants.  Wu Decl.

21 ¶6. While Elavil is used to treat symptoms of depression, clinically it is also commonly used to

---

23       [3]  Plaintiff contends that Elavil should not have been prescribed as treatment, as it could
24 put his mental health at risk.  Pl.'s Decl. 5:2-5, Doc. 72.  Plaintiff fails to raise a genuine dispute
   of material fact.  Plaintiff lacks sufficient competency to provide an expert opinion on this issue
25 as he is not a medical professional.  Fed. R. Evid. 701, 702; Fed. R. Civ. P. 56(c)(4).
26       Defendant Wu declares that he is a licensed physician in the state of California, that he
   received his medical degree in 1972, and that he was employed as a physician with CDCR during
27 the relevant time period.  Wu Decl. ¶ 1.  Defendant Wu has demonstrated that he is qualified to
   testify as an expert regarding medical treatment for patients, including prisoners, based on his
28 experience, knowledge, and training.  Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(4).

treat pain of neuropathic origin, attention deficit hyperactivity disorder, panic disorder, migraines, and tension headaches. *Id.* Prescribing Elavil to treat neuropathic pain does not affect a patient's mental health, unless the patient has been diagnosed with major depressive disorder. *Id.*

On January 27, 2003, Plaintiff had surgery performed by ophthalmologist Dr. Morton on his right eye for his ectropion and dacryocystitis. Wu Decl. ¶7, and Ex. A. Ectropion is the medical term for a condition in which the lower eyelid sags or turns outward. Wu Decl. ¶7. The sagging eyelid leaves the eye surface exposed and can cause redness, tearing, discomfort and discharge. *Id.*

Ectropion surgery involves tightening the muscles of the eyelid and its attachment to restore the eyelid to its more normal position. *Id.* Dacryocystitis is an inflammation of the lacrimal sac (tear sac) at the inner corner of the eye which is frequently caused by lacrimal duct (tear duct) obstruction. *Id.* A lacrimal duct obstruction or blocked tear duct causes the eye to fill with tears, interfering with vision, and can cause pain, redness, and swelling in the inner corner of the lower eyelid. *Id.* If the tear duct leading to the nose is blocked, surgery can create a new one by placing a silicone tube through the tear duct to create a passageway for tears to drain into the nostril. *Id.*

On January 28, 2003, Plaintiff was prescribed Maxitrol for his eye. *Id.*, and Ex. A. Maxitrol is an antibiotic used to treat infections. Wu Decl. ¶7. On February 6, 2003, Plaintiff had a follow up appointment with Dr. Morton who noted that Plaintiff's right eye still watered after surgery. *Id.*, and Ex. A. Dr. Morton recommended that Plaintiff continue to take ointment for his eye. Wu Decl. ¶ 7, and Ex. A.

On February 18, 2003, Defendant Wu submitted an order for Plaintiff to receive glucose tabs. Wu Decl. ¶ 8, and Ex. A. Glucose tabs allow diabetics to raise their blood sugar quickly when needed. Wu Decl. ¶ 8. On February 19, 2003, Defendant Wu prescribed glucose tabs and Dextrose for Plaintiff's hypoglycemia (abnormally low level of glucose). Wu Decl. ¶ 8, and Ex. A. Dextrose is a sterile solution injected intravenously (IV, into the vein) which provides fluids containing various amounts of sugars to the body when someone is not able to drink

1   enough liquids or when additional fluids are needed.  Wu Decl. ¶ 8.

2       Defendant Wu also treated Plaintiff on February 26, 2003 for his diabetes and noted that

3   Plaintiff had suffered from Diabetes Mellitus for 16 years for which he took insulin in the

4   morning and evening, and Plaintiff had neuropathy with tingling in his feet and hands for over a

5   year.  Wu Decl. ¶ 8, and Ex. A.  Defendant Wu prescribed neurontin and Metformin for 60 days,

6   and he refilled Plaintiff's prescription for glucose tabs.  Wu Decl. ¶ 8, and Ex. A.  Metformin is

7   used to help control blood sugar levels for people with diabetes.  Wu Decl. ¶ 8.

8       On February 27, 2003, Defendant Wu prescribed insulin for Plaintiff.  Wu Decl. ¶ 8, and

9   Ex. A.  Defendant Wu refilled Plaintiff's prescription for glucose tabs on April 1, 2003, and

10   prescribed Amoxicillin for Plaintiff's eye.  Wu Decl. ¶ 9, and Ex. A.  Amoxicillin is a penicillin

11   antibiotic used to treat many different types of infections caused by bacteria.  Wu Decl.  ¶ 9.

12       On April 14, 2003, Defendant Wu noted that Plaintiff suffered from allergies and that he

13   had a tear duct obstruction.  *Id.*, and Ex. A.  Defendant Wu prescribed Nasonex spray and

14   naprosyn for Plaintiff.   Wu Decl. ¶ 9, and Ex. A.  Nasonex spray is a corticosteroid that works

15   by reducing inflammatory reactions in the nasal airway in response to allergens and irritants in

16   the air.  Wu Decl. ¶ 9.  It is used for treating and preventing allergic nasal symptoms including

17   congestion, sneezing, itching, and runny nose.  Wu Decl. ¶ 9.  Naproxen (or naprosyn) is a

18   nonsteroidal anti-inflammatory drug used to treat pain or inflammation.  Wu Decl. ¶ 9.

19   On April 29, 2003, Plaintiff complained that the tubing that was placed in his eye during his

20   January 2003 surgery was detached, coming out of his nose, and causing pressure on his right

21   eye.  Wu Decl. ¶ 9, and Ex. A.

22       Defendant Wu treated Plaintiff on April 30, 2003, and observed that Plaintiff had nose

23   irritation due to his plastic tear duct tube.  Wu Decl. ¶ 9, and Ex. A.  Defendant Wu determined

24   that the plastic tear duct was in place, and he prescribed Nasonex spray for Plaintiff's nasal

25   irritation.  Wu Decl. ¶ 9, and Ex. A.  Defendant Wu also ordered that the utilization department

26   check on the follow up appointment with a specialist for Plaintiff.  Wu Decl. ¶ 9, and Ex. A.

27   Plaintiff was scheduled to see an ophthalmologist on May 2, 2003; however, the specialist failed

28   to show up so the appointment had to be rescheduled.  Wu Decl. ¶ 9, and Ex. A.

On May 7, 2003, an ophthalmologist secured Plaintiff's nasal tube. Wu Decl. ¶ 9, and Ex. A. On July 1, 2003, Plaintiff was treated by an optometrist, Dr. Kazi, for tearing in his right eye, and sinus headaches. Wu Decl. ¶ 10, and Ex. A. Dr. Kazi recommend an ENT (ear, nose , throat) evaluation of Plaintiff'S right nasal cavity, and for Plaintiff to receive a follow up appointment within six months. Wu Decl. ¶ 10, and Ex. A. On July 14, 2003, Plaintiff saw Dr. Nguyen and complained of having a problem breathing from his right nose and that his nose spray did not relieve the symptoms. Wu Decl. ¶ 10, and Ex. A. Dr. Nguyen referred Plaintiff to be seen by an ENT specialist. Wu Decl. ¶ 10, and Ex. A. Dr. Nguyen also prescribed Plaintiff glucose tabs and insulin. Wu Decl. ¶ 10, and Ex. A. A progress note signed by Dr. Nguyen on October 1, 2003, provides that Plaintiff complained that he could not breathe out of his right nose, that he took medications and got no relief, and that he wanted to be seen by an ENT doctor. Wu Decl. ¶ 10, and Ex. A. On October 6, 2003, Dr. Nguyen submitted another order for Plaintiff to be referred to an ENT specialist. Wu Decl. ¶ 10, and Ex. A. Plaintiff's insulin and Naproxen were refilled on November 14, 2003. Wu Decl. ¶ 10, and Ex. A.

On November 26, 2003, Plaintiff was seen by an ENT specialist, Dr. Suesberry. Wu Decl. ¶ 10, and Ex. A. Plaintiff complained of nasal obstruction. Wu Decl. ¶ 10, and Ex. A. Dr. Suesberry's notes indicate that Plaintiff had three surgical procedures involving his right eye, apparently on the tear duct. Wu Decl. ¶ 10, and Ex. A. Dr. Suesberry determined that Plaintiff had a mild deformity of the septum of his nose, but it was non-obstructing. Wu Decl. ¶ 10, and Ex. A. Dr. Suesberry diagnosed a probable allergic nasal disease, and chronic lacrimal duct disorder. Wu Decl. ¶ 10, and Ex. A. Dr. Suesberry recommended that Plaintiff be treated for his allergic nasal disease with antihistamines and decongestants. Wu Decl. ¶ 10, and Ex. A. Antihistamines are medications used to manage allergy manifestations such as a runny nose, itchy or watery eyes, nasal congestion, chest congestion, itching, a rash and sneezing. Wu Decl. ¶ 10, and Ex. A.

On December 29, 2003, Dr. Nguyen refilled Plaintiff's prescriptions for Nasonex spray and neurontin for 90 days. Wu Decl. ¶ 10, and Ex. A. Dr. Nguyen signed physician's note on February 4, 2004 renewing Plaintiff's insulin for 90 days. Wu Decl. ¶ 11, and Ex. A. A

physician's note dated March 19, 2004 provides that Plaintiff was prescribed neurontin and Naproxen for 90 days for his neuropathy pain. Wu Decl. ¶ 11, and Ex. A.  Defendant Wu treated Plaintiff on March 29, 2004 and noted that Plaintiff's eye was normal. Wu Decl. ¶ 11, and Ex. A.

On April 2, 2004, Defendant Wu prescribed Enalapril to help control Plaintiff's blood sugar levels. Wu Decl. ¶ 11, and Ex. A.  Enalapril is used to treat high blood pressure, congestive heart failure, and problems caused by diabetes.  Defendant Wu treated Plaintiff on June 3, 2004. Wu Decl. ¶ 11, and Ex. A.  While being treated, Plaintiff mentioned that he was having seizures. Wu Decl. ¶ 11, and Ex. A.  As a result, Defendant Wu submitted a physician's request for Plaintiff to see a neurologist for possible petit mal seizure.  Wu Decl. ¶ 11, and Ex. A. A petit mal seizure is a brief disturbance of brain function due to abnormal electrical activity in the brain.  Wu Decl. ¶11.

Defendant Wu also discontinued Plaintiff's prescription of neurontin because, he contends, neurontin is an adjunctive drug for seizures, and CSATF had recently determined that neurontin was non-formulary for the treatment of neuropathy pain.  *Id.*  When a drug becomes nonformulary it means that the drug is not included in the list of preferred medications that a committee of pharmacists and doctors deems to be the safest, most effective and most economical. *Id.*  A non-formulary drug can still be prescribed, but it is not recommended. *Id.*  As an alternative to neurontin, Defendant Wu prescribed Dilantin because it can be used to treat seizures and prescribed Elavil for Plaintiff's neuropathic pain. *Id.*

During the exam, Defendant Wu also noted that Plaintiff had refused to take his blood tests twice a day, so Defendant Wu also recommended that Plaintiff continue taking insulin two times a day to help control his neuropathic symptoms.  Wu Decl. ¶ 11, and Ex. A.  Later, on the afternoon of June 3, 2004, Defendant Wu was informed that, according to CDCR policy, an inmate could not receive a neurologist referral without having an EEG first.  Wu Decl. ¶ 11.  An EEG or Electroencephalogram is a test that measures and records the electrical activity of your brain by using sensors.  Wu Decl. ¶ 11.  Defendant Wu, therefore, cancelled Plaintiff's neurologist referral.  Wu Decl. ¶ 11, and Ex. A.

On June 8, 2004, Plaintiff signed a refusal form stating that he did not want to take Elavil.

96. Wu Decl. ¶ 12, and Ex. A.  Because Plaintiff refused to take Elavil, Defendant Wu discontinued the Elavil prescription on June 15, 2004.  Wu Decl. ¶ 12, and Ex. A.  On June 21, 2004, Defendant Wu submitted a request for Plaintiff to receive an EEG test to rule out a petit mal seizure. Wu Decl. ¶ 12, and Ex. A.  On August 16, 2004, Defendant Wu cancelled the referral for Plaintiff to receive the EEG because Plaintiff had not had a seizure since he alleged he had one on June 3, 2004, and after reviewing Plaintiff's medical records Defendant Wu found that Plaintiff had no record of having seizures nor had anyone witnessed him having a seizure. Wu Decl. ¶ 12, and Ex. A.  In addition, on July 24, 2004, Plaintiff had stated that he did not have a history of having seizures.  Wu Decl. ¶ 12, and Ex. A.

On July 7, 2004, Defendant Wu treated Plaintiff and noted that Plaintiff refused Elavil because he wanted to take neurontin. Wu Decl. ¶ 12, and Ex. A. Defendant Wu prescribed Elavil once more in an attempt to treat Plaintiff and emphasize that Elavil was commonly prescribed for neuropathic pain. Wu Decl. ¶ 12, and Ex. A.  Defendant Wu also prescribed Metformin and Enalapril to help control Plaintiff's blood sugar levels.  Wu Decl. ¶ 12, and Ex. A.

The same day, July 7, 2004, Plaintiff refused to take the prescribed Elavil. Wu Decl. ¶ 12, and Ex. A.  As a result, Defendant Wu discontinued Plaintiff's prescription of Elavil the following day, July 8, 2004.  Wu Decl. ¶ 12, and Ex. A.  On July 16, 2004, Plaintiff had current prescriptions of insulin, Dilantin, Enalapril, and Metformin.  Wu Decl. ¶ 12, and Ex. A.  Plaintiff was refusing to take Dilantin.  Wu Decl. ¶ 12, and Ex. A.

On July 16, 2004, Plaintiff submitted a form stating that he was refusing to take his insulin, and refusing any treatment from Defendant Wu until he was seen by another doctor. Wu Decl. ¶ 12, and Ex. A.  A Refusal of Examination form dated August 18, 2004 provides that Plaintiff refused a doctor appointment on that day.  Wu Decl. ¶ 12, and Ex. A.  On August 30, 2004, Defendant Wu refilled Plaintiff's prescription for insulin. Wu Decl. ¶ 12, and Ex. A.

On September 1, 2004, Plaintiff submitted a request to be seen by an optometrist to receive updated prescription for new glasses.  Wu Decl. ¶ 12, and Ex. A.  The form was signed on September 2, 2004, noting that Plaintiff was placed on a list to receive an appointment and that the wait would be approximately 60 days.  Wu Decl. ¶ 12, and Ex. A.  Defendant Wu

1   interviewed Plaintiff on October 1, 2004 regarding the use of Elavil to treat Plaintiff's

2   neuropathy.  Wu Decl. ¶ 12, and Ex. A.  Defendant Wu noted that Diabetes Mellitus (DM)

3   control is the best prescription for Plaintiff's neuropathy, otherwise Plaintiff may use Tylenol for

4   pain.  Wu Decl. ¶ 12, and Ex. A.  Defendant Wu also recommended Desipramine, a tricyclic

5   antidepressant used to treat neuropathic pain.  Wu Decl. ¶ 12.

6       On October 22, 2004, Defendant Wu saw Plaintiff and noted that Plaintiff was refusing

7   his twice a day blood tests.  Wu Decl. ¶ 12, and Ex. A.  Defendant Wu advised Plaintiff about the

8   importance of testing his glucose levels twice a day.  Wu Decl. ¶ 12, and Ex. A.  Defendant Wu

9   wrote an order for Plaintiff to receive a follow up appointment with an ophthalmologist, and

10  wrote an order to refill Plaintiff's prescriptions for insulin, Enalapril, and Metformin.  Wu Decl.

11  ¶ 12, and Ex. A.  On November 8, 2004, Defendant Wu wrote an order to refill Plaintiff's

12  prescription for glucose tabs.  Wu Decl. ¶ 12, and Ex. A.  120. Plaintiff was seen by an

13  optometrist on November 19,  2004 who provided Plaintiff with a corrected prescription for

14  glasses.  Wu Decl. ¶ 13, and Ex. A.  Defendant Wu treated Plaintiff on November 22, 2004, and

15  determined that Plaintiff's diabetes was stable, and advised Plaintiff to check his glucose twice a

16  day.  Wu Decl. ¶ 13, and Ex. A.  Defendant Wu saw Plaintiff on December 17, 2004 for

17  Plaintiff's complaint of right eye burn and headache.  Wu Decl. ¶ 13, and Ex. A.  Defendant Wu

18  noted that Plaintiff was refusing his blood glucose checks.  Wu Decl. ¶ 13, and Ex. A.

19      Defendant Wu refilled Plaintiff's prescriptions of naprosyn and Tylenol, and ordered that

20  Plaintiff see an optometrist for his myopia (nearsightedness).  Wu Decl. ¶ 13, and Ex. A.

21  Plaintiff was seen by an optometrist on January 19, 2005.  Wu Decl. ¶ 13, and Ex. A.  The

22  optometrist diagnosed that Plaintiff was nearsighted, had an astigmatism, and that Plaintiff was a

23  diabetic with no retinopathy i.e., damage to the retina.  Wu Decl. ¶ 13, and Ex. A.  The

24  optometrist recommended to "re-make Plaintiff's glasses.  Wu Decl. ¶ 13, and Ex. A.

25      On January 28, 2005, Defendant Wu referred Plaintiff to see an ophthalmologist because

26  Plaintiff complained of recurrent tear duct obstruction in his right eye. Wu Decl. ¶ 13, and Ex. A.

27  Defendant Wu also renewed Plaintiff's prescription for insulin and told Plaintiff to continue to

28  take Naproxen or Motrin, and wrote an order for Plaintiff to be seen again within one week. 129.

Wu Decl. ¶ 13, and Ex. A.  Plaintiff was seen by an optometrist on February 17, 2005. Wu Decl. ¶ 13, and Ex. A.  The optometrist provided Plaintiff with prescription glasses. Wu Decl. ¶ 13. Defendant Wu treated Plaintiff on February 23, 2005 and noted that Plaintiff's appointment with the ophthalmologist had been scheduled.  *Id.*, and Ex. A.

On March 18, 2005, Plaintiff was seen by the ophthalmologist, Dr. Yaplee.  Wu Decl. ¶ 14, and Ex. A.  Dr. Yaplee diagnosed Plaintiff with a tear duct obstruction, and recommended that Plaintiff return with his medical records, and be seen again within one to two months.  Wu Decl. ¶ 14, and Ex. A.  On March 28, 2005, Defendant Wu submitted a request for Plaintiff to receive a followup ophthalmologist appointment.  Wu Decl. ¶ 14, and Ex. A.

Defendant Wu wrote an order for Plaintiff to take Tylenol or Motrin 600mg three times a day for his headaches.  Wu Decl. ¶ 14, and Ex. A.  Defendant Wu treated Plaintiff on April 29, 2005 and noted that Plaintiff had been scheduled to see the ophthalmologist, that Plaintiff's condition was stable, and that he had no new complaints.  Wu Decl. ¶ 14, and Ex. A. Defendant Wu did not treat Plaintiff after April 29, 2005.  Wu Decl. ¶¶ 2, 14. Defendant Wu did not submit a CDC 128B form (informational chrono) to be placed in Plaintiff's file in order to retaliate against him.  *Id.* ¶16.  Defendant Wu contends that he has never retaliated against Plaintiff for any reason, including for Plaintiff filing inmate grievances regarding Defendant Wu's medical treatment of Plaintiff.  *Id.*

On July 16, 2004, Plaintiff refused to take any other medication for his neuropathy pain besides neurontin, and he refused to take his insulin. 141.  Wu Decl. ¶¶ 12, 16.  Because Defendant Wu felt that Plaintiff was attempting to coerce him into prescribing neurontin by refusing to take any medication for his diabetes, Defendant Wu submitted the CDC 128B form. Wu Decl. ¶ 16, Ex. B.  Defendant Wu also used the CDC 128B form as another attempt to inform Plaintiff that the FDA never, and CDC no longer approved neurontin for the treatment of neuropathic pain.  Wu Decl. ¶ 16, Ex. B.

**IV.**   **Analysis**

   **A.**   **Eighth Amendment - Medical Care**

The Eighth Amendment prohibits cruel and unusual punishment.  "The Constitution does

not mandate comfortable prisons." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation and

citation omitted).   A prisoner's claim of inadequate medical care does not rise to the level of an

Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal

civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate

indifference in doing so.'"   *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting

*Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).   The deliberate

indifference standard involves an objective and a subjective prong.   First, the alleged deprivation

must be, in objective terms, "sufficiently serious . . . ."   *Farmer*, 511 U.S. at 834 (citing *Wilson v.

Seiter*, 501 U.S. 294, 298 (1991)).   Second, the prison official must "know[] of and disregard[]

an excessive risk to inmate health or safety . . . ."   *Id.* at 837.

        "Deliberate indifference is a high legal standard."   *Toguchi*, 391 F.3d at 1060.   "Under

this standard, the prison official must not only 'be aware of the facts from which the inference

could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the

inference.'"   *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837).   "'If a prison official should have

been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no

matter how severe the risk.'"   *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175,

1188 (9th Cir. 2002)).

        Defendant maintains that he provided Plaintiff with sufficient medical care, and that

Plaintiff's dispute amounts at most to a difference of opinion between a medical professional and

a patient.   Plaintiff had disputed Defendant Wu's medical care regarding referrals to eye

specialists and neuropathy specialists, as well as Plaintiff's neuropathy medication.

### 1.    Eye Specialist Referrals

        Defendant contends that he provided treatment regarding Plaintiff's eye on the following

days: 1) on April 30, 2003, he treated Plaintiff regarding nose irritation and Plaintiff's plastic tear

duct tubes and determined that the tube was in place, 2) on March 29, 2004, Defendant Wu

examined Plaintiff and determined that his eye was normal, 3) on December 17, 2004, Defendant

Wu treated Plaintiff for his right eye burn and headache complaint by prescribing naprosyn and

Tylenol, and ordering that Plaintiff be seen by an optometrist, 4) on January 28, 2005, Defendant

1   Wu referred Plaintiff to see an ophthalmologist because of complaint of a recurrent tear duct

2   obstruction in his right eye, and ordered that Plaintiff continue to take Naproxen or Motrin, 5) on

3   February 23, 2005, Defendant Wu treated Plaintiff and noted the ophthalmologist appointment,

4   6) on March 28, 2005, Defendant Wu submitted a request that Plaintiff receive a follow-up to the

5   March 18, 2005 ophthalmologist appointment, and 7) on April 29, 2005, Defendant Wu treated

6   Plaintiff, noting no new complaints and that Plaintiff had been scheduled to see the

7   ophthalmologist.   Def.'s Mem. P. & A. 15:23-18:9.

8          Based on the undisputed facts, Defendant Wu referred Plaintiff to receive follow-up

9   appointments, referred Plaintiff to see a specialist, whether for treatment of eye irritation or

10  follow-up appointments, and provided medications as required.  Defendant has met his initial

11  burden of demonstrating that he is entitled to summary judgment.  The burden shifts to Plaintiff

12  to demonstrate a genuine dispute of material fact.

13         Plaintiff contends that on April 30, 2003, Defendant Wu should have referred Plaintiff for

14  return to the Golden State Eye Medical Group, as recommended by Dr. Morton on February 6,

15  2003, rather than referral to the institution's own optometrist. Pl.'s Opp'n 7:27-9:3.  However,

16  Defendant contends that Dr. Morton's February 6, 2003 referral was only for Plaintiff to continue

17  to take ointment for the eye.  Def.'s Mem. P. & A. 15:23-16:2; Ex. A-1, MED 1316.  A review of

18  MED 1316 indicates that Plaintiff was to continue the ointment treatment, and that it should be

19  checked in 3-4 weeks.  However, it is unspecified as to who should perform the check.  Dr.

20  Morton merely recommended a check within three to four weeks.  Plaintiff's declaration is

21  unsupported by this document.  Even if Dr. Morton did recommend that Plaintiff return to him

22  for follow-up care, Plaintiff has not demonstrated that referral to the institution's optometrist

23  amounted to deliberate indifference.  It is at most a difference of opinion between medical

24  professionals. *Toguchi*, 391 F.3d at 1058.  Plaintiff must demonstrate that the course of

25  treatment chosen was medically unacceptable under the circumstances and that it was chosen in

26  conscious disregard of an excessive risk to Plaintiff's health.  *Id.*   Plaintiff fails to make such a

27  showing.  Plaintiff does not raise a genuine dispute of material fact here.

28         Plaintiff contends that he complained of excessive tearing, which caused irritation,

14

infections, and pain.  Pl.'s Opp'n 8:24-26.  Plaintiff opposes Defendant's contention that the

plastic tear duct tube was secured by an ophthalmologist on May 7, 2003.  *Id.* at 9:6-16.

Defendant submits as evidence in support Exhibit A-2, MED 1264.  MED 1264 is Defendant's

progress notes, in which Defendant noted on May 7, 2003 that the tube was removed by an

ophthalmologist in Bakersfield.  Plaintiff contends that this is not true; however, he fails to

provide any declaration or other evidence in support of his opposition.  Thus, Plaintiff has not

raised a genuine dispute of material fact here.

Plaintiff contends that he was seen by Dr. Kazi on July 1, 2003, who re-inserted the tube

exiting Plaintiff's right nasal passage and informing Plaintiff to return for a follow-up

appointment in six months.  Pl.'s Opp'n 9:16-25.  Plaintiff complains that he was never taken

back within the six months, and complained to Defendant Wu of this problem on March 29,

2004.  *Id.* at 9:27-10:4.  Based on the undisputed facts, Plaintiff was seen by Dr. Nguyen on July

14, 2003, who noted Plaintiff's problems with breathing through his right nose.  Dr. Nguyen

referred Plaintiff to an ENT specialist and provided Plaintiff glucose tabs and insulin.  On

October 1, 2003, in a progress note signed by Dr. Nguyen, Plaintiff again complained of his

issues with breathing out of his right nose and that he wanted to be seen by an ENT doctor.  Dr.

Nguyen submitted another order for Plaintiff to be seen by an ENT doctor.  On November 26,

2003, Plaintiff was seen by ENT specialist Dr. Suesberry.  Dr. Suesberry diagnosed Plaintiff with

a probable allergic nasal disease and chronic lacrimal duct disorder, and recommended

continuing Plaintiff's treatment for allergies with antihistamines and nasal decongestants.

It is not disputed that Plaintiff was not seen by Dr. Kazi six months after the July 1, 2003

surgery.  However, Plaintiff received numerous check-ups by other doctors in the intervening

period, including Dr. Nguyen and Dr. Suesberry.  Plaintiff has not demonstrated what harm

occurred as a result of not seeing Dr. Kazi after the six months.  Additionally, there is no

evidence that Defendant Wu knew of any of these issues until Plaintiff saw him again on March

29, 2004.  At that appointment, Defendant Wu determined that Plaintiff's eye was normal, which

Plaintiff presents no facts to dispute.  Even if Defendant Wu erred in his diagnosis, such an error

would amount at most to negligence, not deliberate indifference, and would not support a § 1983

claim. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There is no evidence that would lead a

reasonable trier of fact to conclude that Defendant Wu knew of and disregarded an excessive risk

of serious harm as to this issue.  *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1248

(9th Cir. 2010) ("an officials failure to alleviate a significant risk that he should have perceived

but did not, while no cause for commendation, cannot under our cases be condemned as the

infliction of punishment") (quoting *Farmer*, 511 U.S. at 838).

Plaintiff contends that after he was seen by Defendant Wu on December 17, 2004, he

again complained of not having been seen by an outside ophthalmologist regarding the burning

sensation in his eye and excessive tearing.  Pl.'s Opp'n 11:3-17.  Plaintiff contends that

Defendant Wu only referred him to the optometrist at the institution.  *Id.*  This is undisputed by

both parties.  Plaintiff, however, fails to demonstrate a genuine dispute of material fact.

Defendant Wu refilled Plaintiff's prescriptions for Tylenol and naprosyn, and ordered that

Plaintiff see the optometrist to treat Plaintiff's myopia.  Again, even if Defendant Wu erred in his

diagnosis, such an error would amount at most to negligence, not deliberate indifference, and

would not support a § 1983 claim.  *Estelle*, 429 U.S. at 106.  There is no evidence that would

lead a reasonable trier of fact to conclude that Defendant Wu knew of and disregarded an

excessive risk of serious harm as to this issue.

On January 28, 2005, Plaintiff again complained to Defendant Wu regarding not being

taken back to the outside ophthalmologist.  Pl.'s Opp'n 11:18-12:1.  Based on the undisputed

facts, Defendant Wu referred Plaintiff to be seen by an ophthalmologist for his recurrent tear duct

obstruction.  On March 18, 2005, Plaintiff was seen by ophthalmologist Dr. Yaplee, who

diagnosed Plaintiff with a tear duct obstruction and recommended that he return within one or

two months.  Defendant Wu treated Plaintiff on March 27, 2005, writing an order for Tylenol or

Motrin for Plaintiff, and submitting a request that Plaintiff receive a follow-up with an

ophthalmologist.  Defendant Wu treated Plaintiff on April 29, 2005, and noted that Plaintiff had

been scheduled to seen an ophthalmologist.  Plaintiff contends that this follow-up was never

submitted, and that he was never seen by an ophthalmologist until April 7, 2006.  Pl.'s Opp'n

13:19-22.  However, attached as Exhibit A-5, MED 576 is a Physician Request For Services,

dated March 28, 2005, in which Defendant Wu scheduled a follow-up for Plaintiff to see an ophthalmologist within 1-2 months.  Defendant Wu also attached as an exhibit progress notes which indicate that Plaintiff was scheduled to see the ophthalmologist.  Ex. A-5, MED 310. Plaintiff contends that Defendant Wu must have failed to submit a referral because of the delay in receiving the follow-up with an ophthalmologist.  Pl.'s Opp'n 13:15-19.  This contention, however, is not based on personal knowledge and cannot be used to raise a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(4) (declarations used to dispute a fact must be based on personal knowledge).  Based on the undisputed facts, Plaintiff fails to link any delay in the ophthalmologist referral to Defendant Wu.  It is undisputed that Defendant Wu did not treat Plaintiff after April 29, 2005.

Even making all reasonable inferences in favor of Plaintiff as the non-moving party, Plaintiff has failed to demonstrate a genuine dispute as to any material fact for Defendant Wu's treatment of Plaintiff's eye.  Defendant Wu is entitled to summary judgment as a matter of law with regards to Plaintiff's Eighth Amendment claim here.

## 2.   Neuropathy Specialist Referrals

Defendant contends that Plaintiff did not need a referral to see specialists for his diabetic neuropathy.  Def.'s Mem. P. & A. 19:13-20:8.  On June 3, 2004, Defendant Wu submitted a request for Plaintiff to see a neurologist because he had mentioned having seizures.  *Id.* However, after learning that an EEG was needed first before a neurologist referral, Defendant Wu cancelled the referral.  *Id.*  On June 21, 2004, Defendant Wu submitted a request for an EEG. *Id.*  On August 16, 2004, Defendant Wu cancelled the referral because Plaintiff had not had a seizure since the alleged seizure on June 3, 2004, and Plaintiff stated that he did not have a history of seizures.  *Id.*  Defendant has sufficiently met his burden of demonstrating that there is no genuine dispute of material fact as to this claim, shifting the burden to Plaintiff.

Plaintiff does not deny that he mentioned having seizures.  Plaintiff contends that Dr. Madrilejo, on July 26, 2002, recommended that Plaintiff be returned in 4-6 weeks for follow-up care.  Pl.'s Opp'n 31:17-32:4.  Plaintiff contends that he was never referred to see Dr. Madrilejo during the entire time that Defendant Wu was Plaintiff's primary care provider.  *Id.*

1   Based on the undisputed facts, Defendant Wu did not refer Plaintiff to see a neurologist

2   during the entire time that he was Plaintiff's primary care provider.  However, Plaintiff presents

3   no evidence that would lead a reasonable trier of fact to conclude that a lack of referral amounted

4   to deliberate indifference.  The undisputed facts indicate that Plaintiff received prescriptions for

5   pain and other medication regularly during the time that Defendant Wu was his primary care

6   provider.  Defendant Wu is entitled to summary judgment as a matter of law for Plaintiff's

7   Eighth Amendment claim here.

8                          **3.      Neuropathy Medication**

9           Plaintiff's main dispute with the treatment he received for his neuropathic pain is the

10  medication prescribed by Defendant Wu, Elavil.  Defendant Wu had discontinued Plaintiff's

11  prescription for neurontin after the June 3, 2004 treatment.  Plaintiff contends that his mental

12  health would be put at risk if he was to take Elavil.  However, Plaintiff is not competent to

13  provide such testimony, as he is not a medical professional.  Plaintiff does not declare that he

14  suffered any adverse effects from taking Elavil, as Plaintiff refused to take Elavil when he

15  learned that it was an antidepressant.   Pl.'s Decl. 3:3-6.

16          Defendant Wu contends that neurontin should not be prescribed for Plaintiff because it

17  was an adjunctive drug for seizures, and non-formulary for treatment of neuropathy pain.

18  Plaintiff believes this was error by Defendant Wu, as it is undisputed that Plaintiff is not

19  suffering from a psychiatric disorder.  Plaintiff includes a memorandum, dated March 22, 2004,

20  and addressed to all CDCR physicians, as an exhibit.  Doc. 71, p. 116 of 235.  The memorandum

21  indicated that neurontin should not be used to treat individuals suffering psychiatric disorders.

22          Based on the undisputed facts, Elavil can be prescribed to treat both depression and

23  neuropathic pain.  Even if Defendant Wu did not have to remove Plaintiff from a neurontin

24  prescription, Defendant Wu prescribed Elavil in its place, as an alternative treatment for

25  Plaintiff's neuropathic pain.  Plaintiff's dispute with such treatment amounts to a difference of

26  opinion between a medical professional and a prisoner, which fails to demonstrate deliberate

27  indifference.  *Toguchi*, 391 F.3d at 1058.  Plaintiff fails to raise a genuine dispute of material fact

28  as to his neuropathy treatment.  Defendant Wu is entitled to summary judgment as a matter of

1   law for Plaintiff's Eighth Amendment claims.

2   **B.    First Amendment - Retaliation**

3       Allegations of retaliation against a prisoner's First Amendment rights to speech or to

4   petition the government may support a § 1983 claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th

5   Cir. 1985); *see also Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir. 1989); *Pratt v.*

6   *Rowland*, 65 F.3d 802, 807 (9th Cir. 1995).   "Within the prison context, a viable claim of First

7   Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some

8   adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that

9   such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did

10  not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-

11  68 (9th Cir. 2005); *see Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Rhodes*

12  regarding elements of retaliation in prison context).  At the summary judgment stage, Plaintiff is

13  required to demonstrate that there remains a genuine dispute of material fact as to each element

14  of the claim. *Brodheim v. Cry*, 584 F.3d 1262, 1269 n.3 (9th Cir. 2009).

15      Plaintiff alleges that Defendant Wu retaliated against Plaintiff for filing an inmate

16  grievance[4] by authoring a CDC 128B form (informational chrono), dated July 16, 2004, and

17  placing it in his file.  Defendant Wu contends that the CDC 128B was done because Plaintiff had

18  refused to take any medication for his neuropathy pain besides neurontin, and was refusing to

19  take insulin. Def.'s Mem. P. & A. 21:5-22. Defendant Wu believed that Plaintiff was attempting

20  to coerce him into prescribing neurontin by refusing to take any medication for his diabetes. *Id.*

21  Defendant Wu also contends that the medical record indicates that Plaintiff received constant

22  medical care after the CDC 128B form was placed in his medical file, and thus there was no

23  adverse action. *Id.*

24      Based on the facts presented, with all reasonable inference made in the light most

25  favorable to the non-moving party, Defendant has met his initial burden.  Defendant Wu presents

26  ─────────────

27      [4] The initial inmate grievance in question was filed May 18, 2004, No. SATF-E-04-1989.
    Pl.'s Decl. 4:13-15.  Plaintiff complained that Defendant's proposed Hepatitis treatment was
28  done without proper blood work.

1  a legitimate penological goal as to the filing of the CDC 128B: a notice that Plaintiff is allegedly

2  manipulating medical personnel into providing Plaintiff with the medication that he wants.

3  Proper dispensing of medicine furthers legitimate penological goals of maintaining discipline and

4  order in prison. *See Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (per curiam)

5  (preserving institutional order, discipline, and security are legitimate penological goals).

6  Defendant Wu has also met his initial burden by demonstrating that there was no adverse action

7  otherwise taken against Plaintiff.  As stated previously, Plaintiff received adequate medical care

8  from Defendant.  The burden shifts to Plaintiff to demonstrate that there remains a genuine

9  dispute of material fact such that a reasonable trier of fact could find in favor of Plaintiff.

10  *Anderson*, 477 U.S. at 252.

11       Plaintiff contends that he has the right to decline psychiatric medication, and that the

12  CDC 128B should not have been authored.  Pl.'s Opp'n 37:16-38:2.  However, Plaintiff has not

13  demonstrated that adverse action resulted from the CDC 128B chrono.  Plaintiff contends only

14  that he received inadequate care.  Pl.'s Decl. 14:10-12.  This is unsupported by the undisputed

15  facts in this motion.  When treating Plaintiff, Defendant Wu prescribed medication for Plaintiff's

16  various medical issues and referred Plaintiff to specialists when necessary.  Plaintiff has not

17  demonstrated that there is a genuine dispute of material fact as to any adverse action by

18  Defendant Wu.

19       Plaintiff contends that the proximity of the filing of the chrono to Plaintiff's appeal, and

20  other subsequent actions are indicative of a retaliatory intent.  Pl.'s Decl. 16-18.  At the summary

21  judgment stage, Plaintiff must demonstrate that his protected conduct was the substantial or

22  motivating factor behind the adverse conduct by putting forth evidence of retaliatory motive, that

23  taken in the light most favorable to him as the non-moving party, demonstrated a genuine dispute

24  of material fact.  *Brodheim*, 584 F.3d at 1271.

25       As stated previously, Plaintiff presents no genuine dispute of material fact regarding the

26  CDC 128B chrono being an adverse action.  Plaintiff complains that being prescribed Elavil

27  results in adverse housing and program restrictions.  Pl.'s Opp'n 36:9-11.  However, Plaintiff

28  was removed from his neurontin prescription to comply with new FDA guidelines.  Plaintiff's

complaints regarding referrals for neuropathy or eye treatment also do not raise a genuine dispute of material fact.  Defendant Wu provided referrals to eye specialists when necessary on several occasions, and did not provide a referral to see a neurologist because it was not medically necessary.  Plaintiff has not demonstrated that there is a genuine dispute of material fact regarding a retaliatory motive.[5]  Defendant Wu is entitled to summary judgment as a matter of law for Plaintiff's retaliation claim.

**V.**      **Conclusion**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendant Wu's motion for summary judgment, filed September 22, 2011, should be GRANTED in full;

2.      Summary judgment should be granted in favor of Defendant Wu and against Plaintiff for all claims; and

3.      Judgment should be entered accordingly.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  A party may respond to another party's objections by filing a response within **fourteen (14) days** after being served with a copy of that party's objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __May 16, 2012__            _____/s/ **Dennis L. Beck**_____
                                                            UNITED STATES MAGISTRATE JUDGE

---

[5]  Plaintiff also contends that he did not have an opportunity to review his deposition.  Pl.'s Decl. 14:23-27.  Even if true, Defendant did not rely on Plaintiff's deposition in support of his motion for summary judgment.  Thus, it is irrelevant for purposes of this motion.